May it please the court. My name is Kristen Boyles and I represent the conservation groups in this appeal. I'd like to reserve five minutes of my time for rebuttal. This case is about logging after a fire and let me immediately acknowledge that for better or for worse that fact changes the way people think about this case. But saying that this area is burnt is only to beg the on-the-ground impacts of the biscuit project. The impacts to streams and to soils and to wildlife and to the recovery of the area. Now this is the last summer for logging? This is likely the last summer for logging your honor. The Forest Service has said that the last two sales that are ongoing right now are likely the last sales but they have not withdrawn the authorization for more sales and so we're not sure that there will not be any more. The Forest Service's decision to allow logging in these previously off-limits old growth and roadless areas violates the law in three ways that I'd like to discuss. First, the Forest Service has not shown and we believe cannot show that it has complied with the Saskia National Forest standards for soils. Second, the Forest Service has violated the National Environmental Policy Act by failing to adequately examine cumulative impacts from past projects in this area. Third, the Forest Service is violating the Northwest Forest Plan by allowing extensive logging in designated late successional reserves undermining the very reasons that these old growth forests were protected in the first place. I'll address these points and then turn briefly to the urgency of this happening right now. Turning to my first point that the Forest Service has failed to demonstrate compliance with the relevant soil standards. Just sort of in defining the parameters of what has taken place and and just exactly how much we're talking about here that you know I kind of want to if in your in our Forest Service reduced its preferred salvage of dead trees from over 500 million board feet on 29,000 acres in the draft ESI to 370 million board feet on approximately 19,000 acres in the final ESR. Is that? That is right, Your Honor. From between the draft and the final the project was reduced. I'll have to say that 370 million board feet is still one of the largest projects ever proposed. Now my understanding, will any live or green trees be harvested as a part of the recovery project? Essentially none. Some will for hazard reasons but essentially none. Now is the ground-based salvaging limited to only 44 acres less than a quarter of 1% of the recovery project or do I have that wrong? That is the tractor based logging. That is the logging that is done by tractor. But the acreage that's being... I guess I'm using the ground-based salvaging that as opposed to the helicopter, right? Or am I using that wrong? I believe that we're using it a little differently. I think it's a little differently. The tractor logging is going in there with tractors to do the cutting and the helicopter logging is done obviously they take the logs out with helicopters. Most kinds of logging has to people have to go in they have to skid the logs to different places. There are ground and soil impacts from both kinds of logging. Tractor logging is clearly has more impacts than helicopter logging but they both have impacts to soils. And that's pretty important here when you talk about an area that although this fire burned as a mosaic, some places are severely burned, some places are lightly burned, and those severely burned areas already have soil damage which may well be above the 15% standard but we don't know because they didn't look. And so that's important when you think about then what you put on top whether you're doing tractor logging or helicopter logging. Another question that I have just in terms of because how I believe that the appellees are, you know, how they're framing the issue. Is there any evidence to believe that the recovery project through its implementation of the final EIS's alternative seven will leave less than 90% of the recovery area untouched by any activity as provided by the final EIS? I think that's correct, Your Honor. And that gets us to a point that we've discussed in the briefs many times which is the number games that I believe the Forest Service is playing here. That is a percentage of the entire 500, they're talking about the percentages based on the entire 500,000 acre area of the Biscuit Project. Within that area, it's important to know that 61% of that area did not burn or burn very lightly. Only 16% was severely burned. The impacts that we need to focus on and talk about are the areas that are going to be logged. And when the Forest Service takes and compares the logging, smaller and smaller amounts of logging to larger and larger areas, it's actually playing games with what the harm is going to be on the ground. The harm to those areas that are being logged is not ameliorated because in some other area of this 500,000 acre area, those trees are not being logged. And so we believe that that's misleading to keep trying to show that these are smaller and smaller percentages when it's the logging in the areas that we're talking about which is going to be very important. And the two decisions that we challenged here were logging in the old growth areas and logging in the roadless areas. Those decisions allowed logging on over, well over 10,000 acres. This is not a small amount of logging. And even the logging we have left this summer, the two sales going on, Mike Sculch and Blackberry, are on over 500 acres and have thousands of board feet at stake. So this is not an insignificant amount of logging we're talking about. How much is completed at this point? I don't know how much is completed, Your Honor. I'm sorry. Because the numbers have varied as the seasons have gone on. I know right now with the two sales that are ongoing, they're about, they're slightly over 250 acres each of logging with several, well over, probably over 10,000 board, 10,000 board feet is left. Tell us, tell us why it's important when there's a fire and trees are burnt and destroyed that they ought to just be left standing and let nature take its course. I'm sorry, Your Honor. I missed the first part of that question. The trees were left Well, fire is a natural phenomenon, right? Absolutely. And trees, trees get burned. Sections of trees are burnt and destroyed. So tell us why it's important, if it is, that these burnt trees just remain where they are. Absolutely, Your Honor. Let nature take its course, don't fall. Why is all that so important? It's one of the, it's one of the fallacies of salvage logging or post-fire logging that the trees are dead so we might as well cut them down. We're talking about dead trees so much as we're talking about a dynamic forest. The snags in this area and the dead trees provide all sorts of functions from inhibiting erosion in the steep areas to providing habitat for wildlife to ameliorating soil temperatures and providing shade and protection for the new trees that are growing. We're talking about four years after the fire now and this area is in fire. Logging these areas will put that recovery back. And the, it is not an unusual circumstance here in this region to have fire. How, if you're, have you responded? I didn't want to interrupt what you're saying. I think so because I think our point is made well in the briefs as well that the reason some of these areas, the late succession reserves, were designated as late succession reserves and remain late succession reserves even after they're burnt is to fulfill those particular functions in a forest. And having snags, the reason why the standards and guidelines in the Northwest Forest Plan require you to keep snags in place is just because the scientists have recognized the importance of those trees, dead or alive, in the entire ecosystem. Help me on, if you can, on the amount or number of trees that are left standing instead of those that are on the ground. All the trees, right, most of the trees after the fire now, even though they're dead, are still standing. So if you see a picture of the area, they're standing trees. They'll be not standing when they're cut, obviously, but after the cuts, the cuts that are going on now are, leave some amount of trees standing. However, they're clumped and usually on the edges, and so there are vast areas that will just be treeless. Well, but, okay, getting back to, I think I'm probably, you know, obviously, you might have a different way that you would like them to do this, but that isn't how you're going to prevail. You can't say, I would like, you know, that I don't want you to remove any snags, or, you know, I think that that would be a better way to go because of the, there are certain deferential standards, they get to make certain decisions, and you have, you've only got certain ways that you've got to show violations, or you have to show that something's arbitrary and capricious. Now, when you talk, the soil standard area is an area that I'm interested in, and isn't soil standard 7.2, which I think you're claiming that they violated, correct? Yes, Your Honor. Concerned with the soil condition after the management is complete as, rather than the pre-project condition of the soil. It is, but it doesn't matter because if this case, if they didn't look at the areas and find out what the soil standard was, they won't know whether, they have to know beforehand to know whether they're going to violate it. They're not supposed to violate it. The standard says you're not supposed to have more than 15 percent of the detrimental soil conditions, and that includes burning, so compaction, disruption, and burning. In some of these areas that are severely burned, they're probably well over the 15 percent already, and we're talking about the activity area, as the government has now admitted, in the harvest units. And when they submitted to this Court for the very first time that pile of reports that looked at the, they claim answers are a challenge, which we had never seen before, you'll see that often on those, they show that there are areas that were already well over 15 percent and let logging happen in those areas anyways. I guess I want to ask you about some of the numbers you're using, because I'm not, you know, it seemed to me that they're a little bit of an overstatement, but I want to give you an opportunity to respond, because it isn't your projection of a 36 percent ground disturbance and overstatement of the actual soil disturbance caused by the recovery project. I kind of, I just have an area that I want to ask you, and then you can respond, because isn't the 36 percent figure the projected ground disturbance for only one specific kind of salvaging method, that being the ground-based salvaging, and isn't that salvage method relegated to only 44 acres of the recovery area, which is, in my calculations, almost 0.2 percent of the recovery area? So, you know, to me, I'm looking at that as a little bit of an inflated, you know, I mean, you keep going back to this 36 percent as opposed to the 15 percent, and I'm seeing that you're parsing out this little spot that it's not taking into consideration, because what the helicopters, it's what, a 2 percent disturbance? But, so, let me answer that. Yeah. I mean, that's kind of my general area. I hate to hit you with all of those, but just, if you could help me with that. That's quite all right. And I don't At least no trees are falling in the courtroom. At least no trees are falling in the courtroom, you said. At least not right now. They are falling over to the south. The 36 percent is the number, it's a projection used by the Forest Service for what they were basing their calculations for tractor logging. You're exactly right. We use that number in our briefs solely for the reason it's the only number you can find in the record before they submitted this amount of material to the court. Our argument is not that we've proven a certain violation. Our, those numbers, I think those numbers tend to show that they were thinking there was some high amount of soil displacement already. Our argument is they didn't look first. They did not look in these harvest units before they went out to know if they were at the 15 percent standard. They may have done the calculation for those 44 acres that Your Honor is talking about, but for the other areas, it's not there. And you can look through the record, and it is not there. And that is exactly what this Court has held is incorrect in Ecology Center and Native Ecosystems Alliance, or Native Ecosystems Council, excuse me. And soil is really important. To go back to why trees are important, but soils are important because that is going to be the basis of recovery for this area. This is not a nitpicking disagreement between 15 percent or 37, 6 percent. I think they needed to look first. I think the standard says they must look first so that they know they're going to have enough soil left at the end of this project that you're actually going to have recovery. You're going to have trees growing in that area, so we have the next forest produced. Unless they do that, I don't think we're going to get there. And while you said it's absolutely true that government gets deference, I do not get to say where they should or should not log. We are talking about logging. We did not challenge logging in the entire project. We challenged logging only in the late succession reserves. Those are the old growth forests set aside under the Northwest Forest Plan for special protection and special consideration and in the inventory roadless areas, which, as the Court may be aware of, the subject of a lot of controversy about protecting those areas from roading and logging. And so those areas are the ones that we think have been made available in this action that should not have been. That shows up in the cumulative effects analysis because they have argued that they did not need to look at the cumulative impacts of past actions because the biscuit fire wiped the slate clean, essentially, that we start in 2002 with biscuit and look forward. That is wrong as a matter of law and as a matter of fact. As a matter of law, instead of pointing to the numerous cases from this Court, at least five decisions recently and two last year from the Forest Service that says that the government must catalog past actions and even do more, look at their individual impacts. Instead, the Forest Service is pointing to a 2005 Council on Environmental Quality guidance memo that says exactly the opposite, that you don't have to catalog past actions. And their reliance on that memo, contrary to the clear precedent of this Court, I think is a virtual concession that they haven't done the cumulative impacts analysis right because they didn't look at those past actions. They're wrong as a matter of fact on the cumulative, you know, on biscuit wiping the slate clean. As I said, this is a large area that did not burn evenly. Some areas burned hardly at all or not at all. And so the idea that it's all gone and all we need to look at is things from 2002 on just doesn't make any logical sense. If you think about the specific actions that might have been happening, the fire would not have wiped out effects from road building, from roads. It just doesn't – it can't be that they don't need to look at anything prior to 2002. And again, this matters because cumulative effects analysis gives you that big picture look at the trends. It gives you the look at what might be happening. It allows you to learn from the past actions and propose alternatives in a NEPA document that might avoid those. And if you don't take that look, you're never going to get that bigger picture view of what's going on. You just get that snapshot in time. And we believe that is against NEPA. I see I'm running out of time, Your Honors. I wanted to address quickly the issue of harm here because I know it's – well, it's very important to us because there is logging ongoing right now. And I know Judge Callahan and Judge Pregerson, you've thought about this issue recently when we had our motion for injunction pending appeal. Because of the expedited briefing and argument in this case, which we certainly appreciate, there is still time to stop that logging. The logging at Mike's Gulch only started last Monday, August 7th. The logging at Blackberry, it is – the sale has been sold, but it has not begun. And the size of the logging compared to some other randomly chosen metric is not the question here. The question really is the irreparable harm to those places, to those soils and those forests and that wildlife and the people that care about it. And those areas in the most ecologically important areas, they're late successional reserves, they're the old-growth forests, they're in roadless areas. Well, I guess I know what your harm is. And their harm is that they're saying this, if they don't do it now, there'll be no economic value. It isn't enough. So how to – you know, how is your harm more than their harm? And the precedent of this Court is, Your Honor, that the economic harm is not irreparable, that their harm can be undone. And I – you know, certainly they have an economic interest in this project. That project was bid on – these projects were bid on well knowing the controversy that surrounded this project and that this Court was going to hear this issue this week. I think if Your Honors are inclined to rule in our favor on any of the issues, I have to ask you to issue an injunction quickly and then followed by a written decision. And I know that we have been denied injunction pending appeal. But this logging will be done fairly quickly. And this appeal will be decided on the ground. And any decision from this Court won't matter once the trees are down, unfortunately. So I renew my request at this time. And I'll save my remaining minute for rebuttal. Thank you. And we'll give you a little more time. Thank you. Good morning. May it please the Court, I'm Lisa Jones from the Department of Justice. For the federal appellees with me at council table is Scott Hornbrin for the federal – for the interveners. And we will be splitting our time. I will try to keep an eye. And Scott will try to remind me if I'm going beyond the 13 minutes that we've tried to allocate here. Well, I know there's things that you want to cover and – but would also be helpful rather than just, you know, being bent on covering what you want to cover to respond to what, you know, what appellant's lawyer has. That's exactly what I wanted to start with. In fact, I wanted to turn directly to soils. I know, Judge Preggerson, you indicated that you had an issue with the soils. And I'm hoping that you'll indulge me in trying to explain the record because I – the record here is clear that the Forest Service is not only doing exactly what this Court has required because this case is very factually different from the cases where soils analyses have been struck down. But also, and more importantly, is doing just what the Siskiyou National Forest – Forest Plan requires. May I ask you a question? What – in Yosemite, you remember we had the great fire in Yosemite? I don't personally remember. Not Yosemite, Yellowstone. Yellowstone, National Park, yes. What was done there? Well, National Parks are governed by different standards. I don't know exactly what happened. What was done there? I do not know. I don't think there was any logging of burnt trees there. Well, typically, there's no logging in National Parks anyhow. It's not a multiple-use land allocation. But there was a big push to cut those trees down. Again, Your Honor, though, it's governed by different laws than the National Forests, which are multiple-use. I'm not talking about the laws of nature. Well, Your Honor, let me actually go right to that because you did ask a question. Expressions in the Declaration of Independence to Bohan. You had discussed whether the trees should just remain standing because fire is a natural phenomenon. But you have to take a step back. In this forest, and the Biscuit EIS discusses this in great detail, the Biscuit Fire was not a natural phenomenon. The Biscuit Fire was a catastrophic, high-intensity fire, which is not typically seen on that forest because there have been decades and decades of fire suppression. So you ended up with a forest that didn't have its historic fire-resistant pine species. It had a lot of undergrowth and ladder fuels, had a lot of brush. So when the lightning strikes ignited, they went up and they burned crown and they burned half a million acres on the forest. That is not the normal fire regime on the forest. So what the Forest Service is trying to do with this limited salvage component, with the component of reforesting the forest with the more historic pine, fire-resilient pine species with Douglas fir, and also with creating fire management zones and reintroducing some low-intensity fire so that something like this doesn't happen in the future, this project is intended to get the forest back to a more natural fire regime. And I think the plaintiff's arguments ignore that there's a pretty complex ecosystem, that this forest is not one fire regime, it's actually three or four fire regimes. And this Biscuit EIS talks about all these things in great detail. How did the forest get in that unnatural condition? Because it has been managed with a fire suppression management focus since at least the 1940s. So they haven't been introducing the Forest Service. Your client. Yes, yes. That has been the past management activities and is part of cumulative impacts. That was actually one of the great focuses there. That was past mismanagement, you'd say. Well, I guess there has been, it depends on who you ask, ideologically. I think that, and Ms. Boyles can correct me, but they would prefer that there be, in some instances, no prescribed fire. And that's what people have been arguing for and against for a long time. But the thought was to leave things alone. But at the same time, the forests have been managed for timber resource because they are multiple use. And there has been timber harvest on the forest, which is disclosed throughout the EIS. And so you have a situation where there has been. You guys disclose what? Excuse me? You said disclose something. The EIS discloses the past harvest on the forest. And where you have had trees cut down, you get a younger forest. The composition of the forest has changed. And there was a management decision that they wouldn't use prescribed fire. And you end up with a situation that now the Forest Service is trying to change. But let me turn quickly to the soil standard so that I can explain what the Forest Service did here. First of all, Judge Callahan, you had explained that the soil standard 7-2 is concerned with post-management. That's exactly right. What the forest plan directs the Forest Service to do is to ensure that an area does not, that they leave a minimum of 85% of an activity area, basically, in a non-disturbed state. Where the plaintiffs and the Forest Service, part company, is what exactly needs to be done before implementation. Here the Forest Service conducted broad-scale analysis of soils, took it down, looked at 30% of the proposed salvage units before the rods were signed. And also, and this is very important, the soil standards themselves make clear, and this is soil standard 7-14, that the Forest Service is to use best management practices to mitigate for any soil impacts. And if you look at the forest plan, which explains how to use best management practices, it says that you do your implementation, you do your best management practices when you're implementing the project, and you do it through monitoring. And when you're monitoring, if you find out that there's something going wrong, you can either stop it, you can cancel the contract, you can amend, and that's exactly what's been done here. They seem to want you to test certain things before you start. And they did do that. They went out and looked at the soil conditions. What are the requirements in terms of, they're saying, you know, what legal requirements do you have to do that as opposed to, or is that just something they want you to do? When they are talking about legal requirements, I think that they are trying to read legal requirements out of certain of this court's decisions that address different facts. Lands Council addressed a situation where there had been no on-site verification of a model that was used. Here, the Forest Service did modeling. They've never challenged the modeling, and the modeling used these ground disturbance factor, the 36% for proposed tractor logging, 2% for proposed helicopter logging, which, by the way, does not include skidding. The logs are on the ground. They are lifted out with a helicopter. They're not causing compaction. They're not causing erosion. And, in fact, here, they plugged these into a model, which has never been challenged, projected what they thought would happen, and said, you know what? We have these best management practices, and these are set forth in great detail in our brief. We're going to go out there, and if we aren't meeting it, it can't be done. But the Forest Service has interpreted its forest plan, and this is embodied in the best management practices, to say that where you have an area where the past management, or where some activity, like a fire, has led to an area where there could be an exceedance of the 15% standard, because these standards came into play in the past, I guess, probably about 15 years. There could have been past management as the Forest Service disclosed. There was past management, but the compaction from 50 years ago can still be in place. So there's past noncompliance with 7-2. There is, well, there is past, there are areas where past management would probably exceed the 15% standard. That's not noncompliance. That's what's happened on the ground. Compliance with the standard means what you need to do going forward with an activity from this day forward. But the fact that in the past there's been over 15% doesn't mean that you can't do something in the future. Exactly, exactly. Exactly, and that's explained if you look at Supplemental Excerpt of Record, page 472, what the Forest Service has to do under those circumstances is ensure that any salvage, or importantly, restoration activities, which are activities that could actually improve the compaction from these past tractor logging, that salvage and restoration, quote, will not increase the area of the disturbance and will be designed to move the area toward compliance. And that's what other components of this project, which are wholly ignored by the plaintiffs, are in fact designed to do. I want to turn very quickly. Can you give me an example of what you're talking about? About how a best management practice can be put into play? Well, for instance, the Forest Service is required for every timber sale to have a timber sale administrator monitoring what the operator is doing. And if they go out there and they see, oh, we had, for instance, they had 44 acres in the EIS that could be tractor logged under the modeling that the Forest Service did. Well, when they went out and on the ground, they saw there was more compaction or there were areas that needed to be withdrawn from tractor logging or logging altogether. As we've informed the court of the actual on the ground activities, only five acres ended up being tractor logged. So they modify. Or if they go out there and they see that there are areas, there's an intermittent stream that wasn't there at the time that they had kind of mapped the unit. They set up riparian protections for it. And that's part of the reason why, as we've described in declarations that we've submitted, the amount of salvage has been shrinking over time because they do do these on the ground implementation changes. And that's exactly what the forest plan tells them to do. What testing do they do? Excuse me? What testing do they do? Prior to the salvage, they went out and did testing on 30% of the proposed salvage units and looked at just the same factors. How did they test it? They did a surveying. I actually can't explain the scientific way they tested it. Do they take some dirt and they take it to a lab or do they take core tests? I'm assuming that they took core tests. I can certainly provide the court with that information. I can't say offhand. I know that soil specialists went out and surveyed those soils. I think you can measure things like duff and litter there are certain ways you can tell if soils are severely burned, which is a different question than whether the overstory and the trees are severely burned. There are two different questions and that's described in the shull. Do they test for the microbial life? I think that they do test for those things. I don't want to go beyond my own personal knowledge of how the testing occurred. But here the Forest Service conducted tests on 30% of units Let me ask you this because this is something that's on my mind. In the Forest Service's brief at page seven, I believe the service tells us that 2006 is likely the last season for biscuit salvage activities. That's correct. So at the end of 2000 at the end of this season, that's the end of the logging in the biscuit in that biscuit area? As the declarations state, there is so much deterioration there is likely no more biscuit sales. There are no more planned. There are no more projected. And the only further sales that were going to be offered in the inventory driller series, they've limited them to the two that are ongoing right now. OK, so why why? Why were those bits put out? There was they had they were much that well, the volume is is I think point seven percent of what had been projected based on the deterioration. And it was decided that this was the last season where there could be economic return at all from salvage sales. And that's why they were offered. But there is no expectation to offer any more sales. So the season is going to end pretty soon. The season is going to end pretty soon. And I need to tell you this, but your co-counsel. I know I just if I if you could indulge me for one minute, Scott, I wanted to at least touch base with the cumulative wildlife you know, those on top of the forest. OK. He said no. I know. OK, well, we would just respectfully request that the court affirm. And if it's going to look at past precedent with respect to enjoining this project, I would I would respectfully request that it look at the related cases where this court has balanced the harms on a number of occasions. Well, you gave him 15 seconds. Your Honor, thank you. On the cumulative effects issue, which I'd like to focus on, your case law is admittedly a little diverse in the court's opinions on what you need to do, the the quality of data, the amount of data that you need to do to do an adequate cumulative effects analysis under NEPA. And we would argue the cumulative effects analysis is not unbridled, as plaintiffs suggest, and that the Forest Service is unbridled, unbounded, unbridled, that the Forest Service biscuit cumulative effects analysis isn't arbitrary and capricious when evaluated in light of the reasonable boundaries on that analysis as established in the cases. And that's very important. Plaintiffs cite, and the cases often cite, the general proposition that general statements about some cumulative effects are not adequate. However, there are at least five qualifications of that general analysis that we'd urge you to consider as you evaluate the cumulative effects analysis. The first one is found in your cases in Neighbors of Cuddy Mountain, Blue Mountains, and others, which says that the absence of information is justified when the agency explains why more detailed data can't be provided. And in the soils instance, we were talking about, well, let's, you know, what happened in the past from past timber harvest? Well, the EIS explains in the record at 244, excerpt of record, that compaction disturbance from past harvest is primarily a concern in the previous tractor-logged areas. So they identified that. They went and also acknowledged that, quote, information on logging systems, the tractor, the helicopter, the cable, used in this area is incomplete across the forest. And that's on the same record site. And then they go on to explain that based on the geographic information system, the managed stand information about where you normally would use tractor logging, which is on the more gentle slopes, less than 30%, they estimated that 5,500 acres were harvested with tractor. Now, did they have a unit by unit, sale by sale analysis of past information? They did not. But consistent with your decisions about explaining why they didn't have that and then applying it to their decision-making process to try to minimize the amount of tractor logging, we think they comply with NEPA in your cases. In the case of wildlife, the focus is on the snags, the dead trees, as you mentioned. So how do they comply with our cases? And they respond there that what they did is they did two things. They focused, you've got to look at the context in the cumulative effects analysis. We're not dealing with, you know, spotted owls frolicking through a large canopy. Take it easy on the spotted owls. I sat on all those cases. With all due respect to the spotted owls, the EIS in an appendix has a very detailed explanation of what the condition of the spotted owl habitat was by actual spotted owl home range activity area, they called it. And then they showed what those conditions were in terms of the type of nesting habitat and roosting habitat broken down on some acres and then foraging habitat on other acres. And then they overlaid the fire effects on that. They also explained on the snags after the fire, because now all you have is the dead habitat where the harvest is concentrated, that in the supplemental excerpts of record on page 96, that the response of individual cavity nesting species are variable and are known from only a limited number of scientific studies. So what they focused on in the EIS, they used data, just like your cases say, and they counted and they estimated the number of dead trees, the millions of acres of dead or the millions of dead trees that were there. And they went a step further. They said, now let's make some estimates in our treatment. How many of those trees were going to remove? They went even further than that. They broke it down by the type of plant association group and then within that, they broke it down by the size because that was important. The larger trees are more important than the smaller trees. The second boundary on the cumulative effects analysis is practical considerations of feasibility may limit the effects of analysis and that comes from the Supreme Court. In the Kleppe v. Sierra Club case, and here they were dealing with the largest fire in Oregon history, 500,000 acres. They had 19,000 acres that they were going to proceed. So the fact that they did a sample, sampling is well accepted in the scientific community. You don't have to walk every one of the acres in order to make intelligent choices about what you're going to do. The third issue comes from the Supreme Court or the third limit, Supreme Court's decision in public citizens. It says, in assessing whether the information is required, courts and agencies should consider the usefulness of the information to the decision-making process. And that's entirely consistent with the 2005 CEQ guidance that came out last year. But what the courts seemed to say was that because you were going to do the monitoring, that the district judge seemed to say that there's no indication that you're not going to do what you say you're going to do. Now, how does that factor into all of that? That factors in to what co-counsel was explaining in terms of the mitigation measures, which is another factor which I'll jump to, that in the Selkirk Conservation Alliance and the Edwardson case of this circuit, it says the agency may rely on these mitigation measures as part of its cumulative effects analysis and to support its conclusions regarding cumulative effects. And so what they did in this case, one of the key mitigation measures they used was to limit the amount of tractor logging and they went back and they focused on helicopter logging. Now, how did they pull that out of the air? You'll find in the EIS that this area, when I first started out in environmental law, my first case was the Silver Fire case. It was an EIS, Judge Redden in Oregon. And that Silver Fire burned 30,000 to 50,000 acres in this very area. And so what happened is this decision is informed by the salvage that occurred in that case. They went through and they did logging and they did road construction, although there's no new road construction in this case. And they went out and they monitored. And from that, they developed these best management practices to have buffer zones along the streams, to they concluded that the helicopter logging disturbed about 2 percent of the area and the 30 percent, 36 percent on the tractor logging came from that analysis. It informed their cumulative effects analysis here. And as to the soil standard, it talks about, on excerpt of record, page 522, leaving a minimum of 15 percent of the area in a non-compacted condition. We would argue that when you view that as a whole, they can, consistent with the cases here, apply these best management practices as part of the mitigation. The record, supplemental excerpt of record at page 460, explains this. And they're summarizing the fish habitat and water quality analysis that occurred after the last fire. And it said, this report concluded that the lack of adverse effects from salvage logging in the Silver Fire Recovery Project is attributed to protection of riparian areas. When they check out this, you know, leaving 15 percent of the area in a non-compacted condition, how do they go about that? How do they do that? They do that by doing just what they did here, where they said they've looked at the riparian areas, they've, the minimum disturbance through the use of helicopter logging, they've gone out where they've done it before. Okay. It's informed by past practices. It's not like... What is non-compacted condition that refers to? Here's what they do there. What's the definition of non-compacted condition? And how they assess that is this. A tractor will compact the soil. And so what they do is they go out in a place that's been tractor logged and they measure, and you can make a simplifying assumption, which you can also do an environmental analysis, if the tractor passes over this, it's going to be compacted. And we'll assume that proportion of the area harvested is compacted. And that's where they come up with that information. Now, consistent with the cases, they could go out there. They can go out and run the tractor over 85 percent of the area? They cannot. Because in some ways, this whole compaction tractor issue is a red herring in this particular case, because they've only done five acres out of the 19,000 that they were going to do. And the predominant method has been used by helicopter. But in other instances, when they do this, what they do is they go out and they designate skid trails. In other words, they will flag it out and they'll go out there in the field with the purchaser and say, when you take that tractor out to gather up the logs, we don't want you running all over the unit. And so they do that. They require through mitigation that the harvest occur at a certain time of year. They'll say you do that in the summertime when the soil is dry, because when it's wet, you know, it's just like a piece of toilet paper. If it's all wet, it can compact more than if you just crunch it up and it comes back. And so they have seasonal restrictions. I like the toilet paper now. And on the east side of the mountains, and I see my time is up. That's what they do in the trees when they get through. That's right. And so there's some value for that. Finally, on the... I've been to the mills, so I know. I just point out to the court that two Fridays ago, Judges Schroeder and Reinhart in a related case on the roadless areas denied an emergency stay pending appeal. So to the extent you're inclined to rule for plaintiffs in this case and you think more thought needs to be given to an injunction, we'd strongly urge you not go there. But if you do, the appropriate would be to remand back to the district court to consider, you know, where things are and that sort of thing. But I agree with you. They're trying to work during the time of year when it's dry, when you're going to have the minimum impacts on the soils. And the process is going to be done, Mr. Jones. When the rain starts, the logging stops. Is that it? I see I have a minute. I think what is clear from the argument of both Ms. Jones and Mr. Horngren with respect to the soils is they don't have anywhere to point you in the record that shows that before the project started, they verified that they were not going to violate standard 7-2 for the 15%. You know what I'd like you to do for me? Yes, sir. In just a minute or two, just compress your argument for me. If I said to you, what are your main bullet points? My main bullet points, Your Honor, is they have not shown that they are going to comply with the 15% standard, number one. Number two, they did not look at past actions when considering the cumulative effects, and that's very important in this region. That's number two. Number three, they are logging, allowing logging in the late succession reserves, extensive logging, removing the very trees which the Northwest Forest Plan says have to be kept until the next forest grows for 80 to 100 years. Those would be my three bullet points, Your Honor. The other point I would make to the Court is it's happening right now. And if there's any hope of stopping it, it is right now. I want to address one of your questions, Your Honor. The definition of detrimental soil conditions does not just include compaction. And so Mr. Horngren's discussion of tractor logging is interesting, but it's not the whole story. Detrimental soil conditions are compaction, displacement, puddling, and burning. And when we're talking about an area that did burn and burnt some places severely, you've got to know whether you're already over the standard in those particular harvest units before you go out and look. And as Ms. Jones says, they only looked at 30 percent before they put out the final environmental impact statement. This is exactly the case that happened in a colony. You're saying they didn't do enough, but you aren't saying there's no legal requirement that you look at 100 percent. I say there is a legal requirement, Your Honor. In the Ecology Center case, this Court very clearly held that to authorize first and verify later, and that was a case about a 15 percent soil standard, was a violation of the National Forest Management Act. So, in fact, I am saying that they needed to look first in the harvest units. They didn't have to look everywhere, but where they were going to harvest, because that was the chosen metric they chose. They had to do that first. Ecology Center is directly on point as is Native Ecosystems Council. Mr. Horne. How does the fire damage the soil? I'm sorry? How does fire damage the soil? Fire damages the soil when it burns very hot. The soil gets so hot, it basically burns up all the organic matter, and you're just left with mineral dirt, minerals that you can't grow anything, and it becomes just sand. So you lose that layer of, that wonderful layer when you walk through the forest of the leaves and the litter, and what actually is the soil that can grow the new plants. How about the bugs that live there? Kills the bugs, kills all the microbes. When the soil is severely burnt, you're not growing things back there, or you have a lesser chance of growing things back. I wanted to, I'm out of time, Your Honor. Can I address one? Mr. Horngren is mixing up the cumulative impacts analysis, where we're talking about past actions and the soil challenge. Our soil challenge, as I just said, is particularly about that standard. The cumulative impacts analysis is really about looking at past actions, and your conversation with Ms. Jones showed that their past actions, especially with soils, they've done things that are not according to plan. They have violated that standard, and they haven't looked at those past actions, and they have not looked cumulatively at those past actions. And I urge the Court to look at the final environmental impact statement. The table that they rely on is table 3-1, Roman numeral 3. It's on page Roman numeral 3-10 of the FVIS. It does not look at anything prior to 2002, including the Silver Fire, which Mr. Horngren discussed, which happened in the late 80s. It's not on that table. Okay. You've got to wrap things up. The other – I'm sorry, Your Honor. You should wrap things up. I will wrap things up. Your Honor, I would point out that the injunctions pending appeal that have been denied in other cases  This is the first time this Court has seen the merits of any challenge to the biscuit sale, and we ask your Court to stop the LSR and roadless area logging. Thank you very much. Thank you. All right. Okay. All right. The matter is submitted.
judges: Reavley, Pregerson, Callahan